**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | |
|---|---|
| **DANIEL CAMPASINO**<br>520 Delmar Avenue, Apt. 2<br>Glen Burnie, Maryland 21061<br>*Resident of Anne Arundel County* | Collective/Class Action Claim |
| Plaintiff, | |
| ***Individually and on Behalf of All<br>Similarly Situated Employees*** | |
| v. | Jury Trial Requested |
| **MANHEIM REMARKETING, INC., t/a<br>MANHEIM BALTIMORE-<br>WASHINGTON**<br>6203 Peachtree Dunwoody Road<br>Atlanta, Georgia 30328 | |
| Serve: CSC-Lawyers Incorporating Service<br>Company, R.A.<br>7 St. Paul Street, Suite 820<br>Baltimore, Maryland 21202 | |
| and | Civil Action No.: |
| **COX ENTERPRISES, INC.**<br>6205 Peachtree Dunwoody Road, NE<br>Atlanta, Georgia 30328 | |
| Serve: Corporation Service Company, R.A.<br>2711 Centerville Road, Suite 400<br>Wilmington, Delaware 19808 | |
| Defendants. | |

**COLLECTIVE AND CLASS COMPLAINT FOR WAGES OWED**

DANIEL CAMPASINO, Plaintiff, by and through his undersigned counsel and The Law

Offices of Peter T. Nicholl, hereby submits his Complaint against MANHEIM REMARKETING,

INC., t/a MANHEIM BALTIMORE-WASHINGTON, and COX ENTERPRISES, INC., Defendants, to recover unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Section 16(b) of the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.* (hereinafter, "FLSA"); and unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Maryland Wage and Hour Law, Maryland Code Annotated, Labor and Employment Article §§ 3-401, *et seq.* (hereinafter, "MWHL"); and in support thereof, states as follows:

## INTRODUCTION AND BACKGROUND

Manheim Remarketing, Inc. is in the business of automobile auctions and sales. Manheim Remarketing, Inc. is a wholly-owned subsidiary of Cox Enterprises, Inc. (collectively referred to as "Defendants").[1] With a five hundred (500) acre lot at their Elkridge location, Defendants house thousands of vehicles. To carry out their business, Defendants maintain a repair factory and a body shop. Defendants also maintain a redemption lot and a sales yard for purposes of meeting their clients' needs.

Defendants initially hired Plaintiff to perform work as a driver. Plaintiff was paid hourly for this position at a rate of ten dollars ($10.00) per hour. As a driver, Plaintiff's duties consisted of moving vehicles to their designated location around Defendants' property. To make room for new inventory, Defendants constantly need to shift the position of their vehicles. The constant re-positioning is required to facilitate the preparation, display and sale of their vehicles. Maintenance and repair services also necessitate the regular movement of Defendants' cars.

As Plaintiff's employment progressed, his responsibilities expanded. Plaintiff was subsequently given the title of crew leader. His rate of pay increased to fourteen dollars ($14.00)

---

[1] Any reference to Manheim Remarketing, Inc. includes Cox Enterprises, Inc., as they function as a single enterprise.

per hour. Plaintiff was still primarily required to complete the driving responsibilities discussed above. However, as a crew leader, Plaintiff also had to assist other drivers with navigating the yard. To complete this assignment, Plaintiff was given the additional task of scanning the vehicles' barcodes into Defendants' software. This was to ensure that the location of a vehicle reported in Defendants' software matched its physical location. This gave Defendants' employees the ability to track a vehicle's whereabouts. With this information, drivers were better equipped to locate a designated vehicle when it came time for it to be moved.

Over the course of his employment, Plaintiff was again promoted, this time to the role of operations supervisor. Plaintiff currently holds this position. Plaintiff is still tasked with performing all of the driving duties that he was originally hired to complete. Driving Defendants' vehicles from one location on the property to the next is still Plaintiff's primary function. He is also still required to assist with the tasks assigned to crew leaders.

As an operations supervisor, Plaintiff has the additional task of acting as a liaison between managerial staff, crew leaders and other drivers. Plaintiff serves as a middle-man between those assigning work orders and those receiving them. His additional duties center on delegating these work orders. The work orders are based on Defendants' requirements and are specific to Defendants' instructions. It is demanded that Plaintiff follow these instructions precisely.

As a result of his promotion, Plaintiff is required to work additional hours. Plaintiff now has to work six (6) days a week and is scheduled to work as many as fourteen (14) hours per day. This leads Plaintiff to work excessive hours. Having to complete all of the tasks attributable to the driver, crew leader and operations supervisor positions causes Plaintiff to work overtime consistently.

Although Plaintiff has to work additional hours, he is not properly compensated for the extra work he performs. Upon being promoted to operations supervisor, Defendants changed Plaintiff's method of pay. Plaintiff is now paid a salary and is classified as an exempt employee. However, contrary to the title of his new position, Plaintiff's role is not supervisory. Plaintiff does not possess power or discretion over Defendants' employees or policies. He also lacks the authority to make hiring or firing decisions.

Nothing regarding Plaintiff's new position justifies an exempt classification. Plaintiff's primary duties still center on driving Defendants' vehicles around the yard. There isn't anything "executive" regarding this role.

Defendants began to pay Plaintiff a salary for the purpose of evading Federal and State wage laws. Defendants are fully aware that Plaintiff's duties do not exempt him from the overtime requirements of the FLSA or MWHL. Plaintiff should receive additional compensation for all hours worked over forty (40) in a workweek. Defendants refuse to pay Plaintiff the wages he rightfully earned.

There are other employees of Defendants' who perform duties that are similar to Plaintiff's. These similarly situated employees are staffed at various locations across many states. These employees are also erroneously classified as exempt and are being underpaid. Defendants' unlawful practices are implemented nationwide.

## THE PARTIES

1.     Plaintiff Daniel Campasino (hereinafter, "Plaintiff") is an adult resident of Anne Arundel County, Maryland.

2.     Defendant Manheim Remarketing, Inc. (hereinafter, "Manheim" or "Manheim Baltimore-Washington") is an incorporated for-profit business dealing in the sale of used and new vehicles.

3.     Manheim is headquartered in Atlanta, Georgia.

4.     In 2007, Manheim registered the trade name "Manheim Baltimore-Washington" and currently trades under that name.

5.     Manheim Baltimore-Washington operates out of Elkridge, Maryland.

6.     Defendant Cox Enterprises, Inc. (hereinafter, "Cox") is an incorporated for-profit business.

7.     Cox is headquartered in Atlanta, Georgia.

8.     Cox is the parent corporation of Manheim.

9.     Cox exercises corporate control over Manheim.

10.     Manheim is a subsidiary of Cox.

11.     Defendants are engaged in a common enterprise.  Although various Manheim companies operate under different names, including Manheim Remarketing, Inc., they are all owned by Cox.

12.     Manheim and Cox (hereinafter, collectively referred to as "Defendants")[2] are jointly responsible for the manner in which Plaintiff is paid his wages.

13.     Defendants are Plaintiff's joint employers under the FLSA and MWHL.

14.     Defendants' operations center on conducting wholesale automobile auctions.

15.     Defendants also provide various vehicle-remarketing services.

---

[2] Hereinafter, any reference to Defendants shall include their corporate officers and all those empowered to act as agents of the corporations, either explicitly or implicitly, or who are designated as agents under the doctrine of apparent agency.  To the extent individual agents are responsible for any actions alleged in this Complaint, they are hereby incorporated by reference within the term "Defendants."

16.     Defendants own and operate a variety of secondary businesses which provide support for all levels of the repair and restoration processes related to the sale of these vehicles.

17.     Defendants are subject to the FLSA and MWHL by the nature of their business enterprise.  At all times relevant to the Complaint, Defendants were in the industry of automobile sales.

18.      Defendants are subject to the FLSA and MWHL due to the amount in revenues generated.  Defendants' annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

19.     From approximately April of 2012 until the present, Plaintiff has been employed with Defendants.

20.     At all times relevant to this Complaint, Plaintiff has engaged in interstate commerce by the nature of the duties performed as part of his employment with Defendants.

21.     Plaintiff worked for Defendants, who, at all times throughout Plaintiff's employment, fell within the description of the term "employer" under the FLSA, 29 U.S.C. § 203(d) and MWHL, § 3-401(b).

22.     At all times relevant to this Complaint, Defendants supervised the administration of their business and set employee schedules, including the schedules of Plaintiff and others similarly situated.

23.     Defendants possessed and exercised authority to determine the hours worked by Plaintiff and other similarly situated employees.

24.     Defendants controlled and supervised the work performed by Plaintiff and others similarly situated.

25.     Defendants were actively engaged in the management and direction of Plaintiff and members of the putative class.

26.     Defendants had the power and authority to change the course of Plaintiff's and other similarly situated employees' duties.

27.     Defendants made all decisions relating to Plaintiff's and other similarly situated employees' rate and method of pay.

28.     Plaintiff and all those similarly situated recognized Defendants' authority and obeyed Defendants' instructions.

## JURISDICTION AND VENUE

29.     Original jurisdiction in this Honorable Court is expressly provided by the FLSA, 29 U.S.C. § 216(b).  This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

30.     Discretionary supplemental jurisdiction of Plaintiff's Maryland state law claims is provided by 28 U.S.C. § 1367(a); the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts, on which Plaintiff's federal claims are based.

31.     No reasons exist that would force this Honorable Court to decline jurisdiction; the state law claims (i) do not raise novel or complex issues of state law, (ii) do not substantially predominate the claims over which this Honorable Court has original jurisdiction and (iii) no exceptional circumstances exist that would constitute a compelling reason for declining jurisdiction, thereby satisfying 28 U.S.C. 1367(c).

32.     Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred primarily within the State of Maryland.

33.     This Honorable Court has personal jurisdiction over Defendants.  Defendants are registered with the Maryland Department of Assessments and Taxation in order to conduct business in Maryland.

34.     Defendants also conduct sufficient business within the forum state so as to constitute a submission to its laws.

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

35.     Defendants are a common enterprise engaged in the operation of automobile auctions.

36.     Defendants are the world's largest wholesale automobile auction company, with over one hundred and forty-five (145) auction sites throughout North America, Europe, Asia and Australia.

37.     Defendants' primary business is wholesaling vehicles via a bidding process.  This is completed by traditional in-person auctions as well as online forums.

38.     Defendants also provide other dealership and wholesale services.  These services include title work, financing and automotive re-marketing.

39.     Defendants carry out their business across the United States.  There are approximately one hundred and ten (110) auction locations nationwide.

40.     Plaintiff's duties were performed at Defendants' Elkridge location ("Manheim Baltimore-Washington").

41.     This location is an automobile auction site.  It has a five hundred (500) acre lot that holds thousands of vehicles.[3]

42.     The lot is open for individual sales daily.

---

[3] Similar sites exist across the country; they are owned by Defendants Cox and/or Manheim.

43.     Defendants also hold weekly auctions at this location.

44.     Manheim Baltimore-Washington has split its property into two distinct departments: sales and inventory.

45.     The auctions are conducted on the sales side of the property.

46.     Related services are also carried out on the sales side.  For instance, Manheim Baltimore-Washington maintains an area where its clients can test drive its vehicles.

47.     Manheim Baltimore-Washington also maintains a lot for sold vehicles.

48.     There is also an area designated for redeemed vehicles.[4]

49.     The inventory side is where Manheim Baltimore-Washington stores vehicles.

50.     These vehicles are typically in need of repair or maintenance.

51.     In order to prepare its vehicles for sale, Manheim Baltimore-Washington contracts with a body shop located on the property.

52.     Defendant Manheim Baltimore-Washington also contracts with a detailing shop on the premises.

53.     There is an area on the property designated for condition reports.  The purpose of this area is to document the state of all incoming and outgoing vehicles.

54.     Defendants' vehicles needed constant repositioning to make room for additional inventory.

55.     Manheim Baltimore-Washington receives hundreds of new vehicles each week.

56.     Plaintiff's employment with Manheim Baltimore-Washington began in April of 2012.

---

[4] Redeemed vehicles are those that were once repossessed but can be later reclaimed subsequent to the previous owner's re-payment of the requisite fees.

57.     Over the course of his employment, Plaintiff has held three (3) positions: driver, crew leader and operations supervisor.

58.     Plaintiff worked as a driver from April of 2012 until August of 2014.

59.     During his time as a driver, Plaintiff was paid at a rate of ten dollars ($10.00) per hour.

60.     As a driver, Plaintiff's primary task was driving Manheim Baltimore-Washington's vehicles to and from designated areas within the Elkridge facility.

61.     Plaintiff followed all of Defendants' instructions in regard to the performance of this task.

62.     Plaintiff's tasks consisted entirely of driving cars from one location on the property to another.

63.     The area where Plaintiff had to transport the vehicles depended on the services needed.

64.     Some of these services included detailing and body work. Others included maintenance and repairs.

65.     When vehicles were in need of a condition report, Plaintiff had to transport them to the designated yard.

66.     Plaintiff had to transport vehicles to the redemption lot once they were officially reclaimed.

67.     Plaintiff was required to transport cars to the sales floor at the time they were ready to be auctioned.

68.     Plaintiff was compensated correctly while employed as a driver.

69.     In August of 2014, Plaintiff was promoted to crew leader.

70.    During his time as a crew leader, Plaintiff was paid at a rate of fourteen dollars ($14.00) per hour.

71.    Plaintiff's role did not dramatically change with this promotion. His primary duties still consisted of driving Defendants' vehicles to designated areas around the yard.

72.    Plaintiff was given the additional responsibility of having to scan a vehicle's barcode. This was completed through the use of a handheld scanner linked to Manheim Baltimore-Washington's database.

73.    The database assisted Plaintiff and other drivers in locating vehicles once they had been moved. This was for efficiency purposes due to the size of Manheim Baltimore-Washington's lot.

74.    During the time Plaintiff was a crew leader, there were approximately five (5) other crew leaders on site.

75.    Each crew was assigned to a specific area on Manheim Baltimore-Washington's property.

76.    Each week, different part-time drivers would come in to assist their crew with driving the vehicles to their designated area.

77.    Plaintiff and other crew leaders were responsible for helping their crew of drivers navigate the yard.

78.    Plaintiff and other crew leaders were also responsible for assisting drivers with their duties. This consisted of Plaintiff and other crew leaders having to also drive vehicles to and within their appropriate lot.

79.    Crew leaders were essentially just more experienced drivers. Driving vehicles to their designated yard was still Plaintiff's and other crew leaders' primary function.

80. Plaintiff was compensated correctly during his tenure as a crew leader.

81. During his time as a crew leader, Plaintiff received overtime payments at a rate of "time-and-a-half" his regular rate of pay for all hours worked over forty (40) in a week.

82. In December of 2015, Plaintiff was promoted to operations supervisor, the title he currently holds. At this time, Plaintiff ceased being paid on an hourly basis.

83. Contrary to his title, Plaintiff's role is not supervisory. Plaintiff does not exercise power or discretion, nor does he have the authority to make administrative decisions.

84. As the operations supervisor, Plaintiff is still required to complete his same basic driving duties. These duties continue to take up the vast majority of Plaintiff's workday.

85. The operations supervisor and crew leader positions are very similar. The primary difference is that operations supervisors are required to work more hours than crew leaders. This is due to the few additional responsibilities required of the position.

86. The operations supervisor serves as a liaison between Defendants' managerial staff and its crew leaders and drivers.

87. Defendants' management issues daily work orders to Plaintiff. Plaintiff then distributes the work orders to crew leaders, who in turn distribute the orders to drivers.

88. Plaintiff and other operations supervisors obtain this information through Defendants' software.

89. Plaintiff and other operations supervisors have access to this software. They are issued company laptops, which allow them access to Manheim Baltimore-Washington's network.

90. Defendants' vehicles are constantly moved throughout the yard. Access to the network enables Plaintiff and other operations supervisors to ascertain where vehicles are located.

91.     Once a vehicle is moved, the laptops allow Plaintiff and other operations supervisors to acquire the most up-to-date information regarding a vehicle's whereabouts.  This information is transmitted in "real time."

92.     As an operations supervisor, Plaintiff is required to inform crew leaders and drivers of a vehicle's exact location.

93.     Plaintiff is contacted constantly by crew leaders and drivers when they are unable to locate a particular vehicle.

94.     Crew leaders and drivers also regularly contact Plaintiff when they are unable to determine where a vehicle belongs.

95.     Plaintiff is required to remain available at all times in order to answer these questions.[5]

96.     Plaintiff's possession of the laptop enables him to answer the questions posed by crew leaders and drivers.

97.     Crew leaders and drivers do not have access to this information.  This information can only be attained through the company laptops.[6]

98.     The number of laptops on-site is limited.  Because of this, Manheim Baltimore-Washington does not distribute laptops to crew leaders or drivers; they are only distributed to operations supervisors.

---

[5] Plaintiff is required to maintain an electronic device on his person to ensure that he can be reached. Plaintiff has been issued a handheld two-way radio.  At times, Plaintiff is also required to use his personal cell phone.

[6] Plaintiff and other operations supervisors are required to be on-site during regular business hours.  This is to ensure that someone with access to Defendants' software is available at all times.

99.     Plaintiff's access to the laptops does not give him any extra authority.  It only grants him access to additional information.

100.    Utilizing the laptop requires no special skill, advanced knowledge, or training.

101.    Plaintiff has no discretion regarding his use of the laptop.

102.    The laptop serves only as a means for Plaintiff to access Defendants' software and to receive Defendants' instructions.

103.    Plaintiff's use of the laptop is always at Defendants' discretion.

104.    Plaintiff is prohibited from using the laptop for any purpose other than communicating with Defendants' employees.

105.     The scope of these communications is dependent upon where Plaintiff is assigned.

106.    When assigned to the sales side of Manheim Baltimore-Washington's property, Plaintiff is primarily tasked with making sure all vehicles are parked correctly in the sales queue.

107.    The manner in which this is to be completed is based on Defendants' instruction.

108.    Plaintiff has no discretion regarding these instructions.

109.    All decisions regarding the manner in which vehicles are to be parked are made by Defendants' higher-level officials.  They are communicated to Plaintiff via the laptop.

110.    Plaintiff has to disseminate Defendants' orders to crew leaders and drivers.

111.    Plaintiff must ensure that the orders are carried out in the precise manner in which they are reported.

112.    When working on the inventory side of Defendants' property, Plaintiff is primarily responsible for locating vehicles that are designated to be moved throughout the yard.

113.    Information concerning where the vehicles are to be transported is also communicated through the laptop.

114.    Plaintiff is responsible for relaying this information to crew leaders and drivers.

115.    The manner and format regarding the distribution of this information is aligned with Defendants' strict protocols.

116.    These protocols are enforced on both the sales and inventory sides of Defendants' business.

117.    Defendants carry out these protocols by issuing various reports.

118.    As the operations supervisor, Plaintiff is responsible for assembling these reports.

119.    The reports are specific to the vehicles that have to be moved.

120.    The reports include identifying information for each vehicle.

121.    The reports also contain the location of the vehicle and any services that are required.

122.    Prior to the start of each shift, Plaintiff has to print and organize these reports.  This has to be completed before crew leaders and drivers arrive.

123.    Upon their arrival, Plaintiff has to distribute the reports to crew leaders and drivers. Through this process, each crew is made aware of which vehicles they are responsible for moving.

124.    The particular crew of drivers charged with moving a set of vehicles is determined by Defendants' software.  Plaintiff has no discretion regarding which crews are assigned to a vehicle group.

125.    Plaintiff also has no discretion regarding which vehicles are to be moved.  This information is pre-determined through Defendants' software.

126.    By generating the reports, Defendants' software automatically provides the specific area where each vehicle is to be transported.  Plaintiff is not involved with this process.

127. Plaintiff is only responsible for informing the crews where each vehicle on the report belongs.

128. The reports come to Plaintiff in the form of multiple lists. The lists are specific to each yard on Manheim Baltimore-Washington's premises.

129. For instance, each day, there is a specific crew of drivers designated to bring vehicles to the redemption lot.[7] Plaintiff is responsible for ensuring that all vehicles designated on the redemption list are retrieved.

130. Lists designating the vehicles that are to be transported to the condition lot are also transmitted to Plaintiff.[8] Plaintiff is responsible for distributing these lists as well.

131. Plaintiff is also responsible for distributing the "body shop list." Plaintiff has to ensure that the vehicles designated within this list are positioned in the body shop as scheduled.

132. Plaintiff is also charged with preparing the lists specific to Defendants' auctions. Vehicles that have to be moved from Manheim Baltimore-Washington's inventory lot to the sales lanes are included in these lists.

133. On the day of auction, Plaintiff is responsible for distributing these lists to "lane leaders." These are the persons responsible for showcasing the vehicles and bringing them to their appropriate lane.

134. Distribution of the various lists does not require any specialized training.

135. Performance of this task does not require any analysis.

136. Plaintiff does not have to write any reports.

---

[7] Manheim Baltimore-Washington is not permitted to sell vehicles before a specified period. This is to ensure that the previous owners have an opportunity to reclaim their vehicles. The majority of Defendants' vehicles come from insurance companies, dealer trade-ins and lease returns. Therefore, ensuring that all of the vehicles designated on the redemption list are retrieved is a relatively minor part of Plaintiff's duties.

[8] All vehicles on Manheim Baltimore-Washington's property are required to undergo a condition report.

137. To distribute the lists, it is not necessary for Plaintiff to interpret any information.

138. Plaintiff has no say regarding the manner in which the lists are distributed; he simply hands out the lists to the crews of drivers pursuant to the instructions that he is given.

139. Plaintiff is not involved with any aspect of the crew leaders' or drivers' schedules. Plaintiff is only responsible for distributing their assignments.

140. Plaintiff does not exercise power over the crew leaders or drivers.

141. Plaintiff also does not have the authority to hire or fire these persons.[9]

142. Plaintiff does not supervise any employees.

143. Defendants' managers are the persons responsible for supervising Plaintiff, crew leaders and drivers.

144. Defendants' managers consistently walk around the yard to ensure that Plaintiff, crew leaders and drivers are performing their tasks correctly.

145. There is always a manager on site to inspect whether Plaintiff's and other similarly situated employees' assignments are being carried out efficiently.

146. Justin Holden (hereinafter, "Holden") is the operations manager at Manheim Baltimore-Washington. He is the person that is primarily responsible for monitoring Plaintiff's and others similarly situated employees' tasks.

---

[9] On occasion, Plaintiff had to attend job fairs. His role consisted of providing potential new employees with a questionnaire. Plaintiff had no discretion in the performance of this role. The questionnaire was developed by Defendants. Plaintiff had no say regarding its content. According to Defendants' criteria, if a prospective employee answered the questions correctly, Plaintiff was only required to mark the questionnaire "good fit." This was a systematic process. Whether or not a candidate was a "good fit" was based on Defendants' formula, not Plaintiff's personal judgment. From there, Plaintiff would immediately forward the prospective employee questionnaire to human resources personnel, who would also be in attendance at the job fair. Plaintiff's involvement ceased at that time. He was not required or expected to do anything else. Human resources personnel would continue the process from there. Human resources personnel would then interview the potential candidate. Human resources personnel made the ultimate decision regarding whether a candidate should be hired. Plaintiff had no input regarding this decision, nor was his opinion ever sought.

147.    Plaintiff does not have any input or discretion in regard to his assigned tasks.

148.    Plaintiff simply serves as a liaison between management officials who assign the tasks that are to be completed and the drivers responsible for their completion.

149.    Plaintiff satisfies the requirements of his job and adequately performs his duties to benefit Defendants.

150.    Plaintiff completes all of his duties to the extent required by Defendants.

151.    For the aforementioned work, Plaintiff receives bi-weekly payments of one thousand nine hundred twenty-three dollars and eight cents ($1,923.08), reflecting an annual salary of approximately fifty thousand dollars ($50,000.00).

152.    Plaintiff receives the same bi-weekly salary regardless of the number of hours he works each week.

153.    Plaintiff consistently works well over forty (40) hours each week. This has been a regular occurrence from the time he was promoted to operations supervisor.

154.    The overtime Plaintiff works stems from his excessive schedule.

155.    Plaintiff routinely works six (6) days a week.

156.    Plaintiff is also regularly scheduled to work approximately fifty-eight (58) to sixty-five (65) hours each week.

157.    Plaintiff's demanding schedule is largely due to the number of duties that are specific to the operations supervisor position.

158.    For instance, Plaintiff has to ensure that he arrives to work well before the time crew leaders and drivers are scheduled to report.  This is for purposes of preparing and printing the lists specific to their assignments.

159.     Defendants require Plaintiff to prepare these lists prior to when the crew members arrive.  This is to ensure that crew leaders and drivers can get right to work without experiencing any delay.  This policy is strictly enforced.

160.     The crews of drivers are typically scheduled to start work at 7:30 a.m.  This results in Plaintiff having to arrive to work by 6:30 a.m. in order to complete his pre-shift duties.  Reporting at this time has the result of elongating Plaintiff's workday.[10]

161.     Coming in early causes Plaintiff to always work over eight (8) hours a day.  He works at least this length of time each day that he is scheduled.  This directly impacts the number of overtime hours Plaintiff works each week.

162.     The time Plaintiff is able to leave work depends on the day.  There are duties inherent to Defendants' business that require certain tasks be completed on specific days.

163.     Defendants mandate the completion of these tasks before Plaintiff can leave work.

164.     For instance, every Monday, although Plaintiff typically begins his day at 6:30 a.m., he normally cannot leave work until 8:00 p.m.  It is routine for Plaintiff to work almost fourteen (14) hours on Mondays.

165.     Plaintiff is required to work this schedule on Mondays because Manheim Baltimore-Washington's auctions take place on Tuesdays.  As the operations supervisor, Plaintiff is required to ensure that all vehicles scheduled for sale are moved to the sales lines.  Plaintiff is required to complete this task before the yard closes on Mondays.

166.     Due to the size of Defendants' property, combined with the sheer number of vehicles that are auctioned, completion of this task is extremely time consuming.

---

[10] During certain periods throughout the calendar year, which are attributable to daylight savings time, it is common for Plaintiff to arrive earlier than the time he typically reports.

167.     A small sale can consist of as many as twenty-five hundred (2,500) vehicles.  A large sale can include as many as thirty-three hundred (3,300) vehicles.

168.     On auction day, all of the specified vehicles have to be neatly lined along the sales line.  On Mondays, Plaintiff has to ensure that all of these vehicles are accounted for.

169.     Accounting for all of these vehicles is an arduous process. Plaintiff has to retrieve multiple vehicles from various lots and position them correctly in the sales line.

170.     Every Monday, Plaintiff, crew leaders and other drivers work in tandem.  Their goal consists entirely of driving vehicles that are up for sale to their appropriate slot.  There is constant pressure from management regarding the timely completion of this assignment.

171.     To guarantee things are in order prior to the start of the auction, Plaintiff regularly reports to work by 5:00 a.m. on Tuesdays.

172.     Plaintiff's mornings primarily consist of inspecting the vehicles in the sales lane. This is the last opportunity to ensure that all vehicles are accounted for and lined up appropriately.

173.     It is not unusual for mistakes to occur Monday night.  Plaintiff is required to correct these mistakes.  This entails retrieving missing vehicles from the yard and repositioning vehicles in their correct order.

174.     The auction typically ends at around 1:00 p.m.  However, Plaintiff must continue to work.

175.     There are regular meetings scheduled after the auction. These meetings typically begin at 1:30 p.m.  Defendants' high ranking officials require Plaintiff and crew members to attend these meetings every Tuesday.

176.    The topic primarily discussed at the meetings is what work must be performed after the auction.  It is routine for Plaintiff and crew leaders to receive additional assignments at this time.

177.    These assignments typically consist of Plaintiff, crew leaders and drivers having to move vehicles that were not sold back to the appropriate yard.

178.    It is also common for Plaintiff and other drivers to be tasked with moving vehicles that were not associated with the auction.

179.    Every Tuesday, Plaintiff is also tasked with printing the post-sale inspection report. Information regarding sales made during the auction is included within this report.  Plaintiff is responsible for providing this report to management.

180.    The combination of these assignments requires Plaintiff to work until 4:00 p.m. on Tuesdays.[11]  This results in Plaintiff regularly working over eleven (11) hours on auction day.

181.    On Tuesdays, Plaintiff's workload can result in having to work even longer.  For instance, low sales at the auction often results in Plaintiff having to move an increased number of unsold vehicles back to the inventory lot.

182.    On Wednesdays, Plaintiff routinely arrives to work by 6:30 a.m. and departs at 4:00 p.m.  Due to the auction occurring the previous day, Plaintiff's primary duty on Wednesdays consists of moving purchased vehicles from the sales floor to the sold lot.

---

[11] Due to his continued frustrations with not being compensated for overtime, Plaintiff recently began asking management for permission to leave at 2:00 p.m.  Plaintiff was occasionally granted this request.  However, due to the fact that there is always work to be done, Plaintiff's requests are often denied.  The nature of Defendants' business requires the constant repositioning of their vehicles.  Completion of this task falls within the direct scope of Plaintiff's responsibilities.

183. The performance of this task takes up the majority of Plaintiff's day. Transporting vehicles from the sales floor to the sold lot usually accounts for the full ten (10) hours that Plaintiff is scheduled to work on Wednesdays.

184. Plaintiff also consistently works ten-hour (10) days on Thursdays and Fridays. Plaintiff regularly arrives to work at 6:30 a.m. and leaves at around 4:00 p.m., the time he is scheduled to depart. Driving vehicles to and from various lots on Defendants' premises is where the majority of Plaintiff's time is spent.

185. On Thursdays and Fridays, Plaintiff's day largely consists of transporting vehicles from the inventory lot to the body shop. This is to ensure that all vehicles to be auctioned the following week are conditioned for sale.

186. Defendants have made clear to Plaintiff that this is a top priority.

187. Defendants consistently reiterate the importance of ensuring that vehicles are moved to the body shop on time.

188. Plaintiff has to regularly inspect the body shop to ensure that Defendants' concerns are being addressed. This typically occurs in between the time that he is driving.

189. Plaintiff is also required to work on weekends. He is scheduled to work almost every Saturday.

190. When Plaintiff works on Saturdays, he typically arrives at 7:00 a.m.

191. His duties consist of tending to business left unfinished during the week. This primarily entails having to drive vehicles that should have already been moved to their designated lot.

192. Plaintiff used to be permitted to leave work at 2:00 p.m. on Saturdays. However, his workload has progressively grown. This resulted from the increased number of vehicles that Defendants regularly receive.

193. Because of the increase, more vehicles must be moved throughout the week. Defendants have made clear that all vehicles designated to be moved during the week must be moved by the end of business on Saturdays.

194. Due to his increased workload, Plaintiff is not permitted to leave until 4:00 p.m. on Saturdays. This causes Plaintiff to regularly work nine (9) hours or more on weekends.

195. Plaintiff's excessive workload also prevents him from taking a lunch break. It is routine for Plaintiff to work straight through his shifts. This further contributes to the number of overtime hours Plaintiff works each week.

196. Plaintiff's demanding schedule forces him to work overtime consistently. It is routine for Plaintiff to work as many as fifty-eight (58) to sixty-five (65) hours each week.

197. Plaintiff has frequently complained to management regarding the excessive hours he works. These complaints were typically made to Holden, the operations manager of the yard and Plaintiff's immediate supervisor.

198. Plaintiff has complained to Defendant's other agents as well. These agents include the assistant general manager, who Plaintiff knows as "Rich," in addition to the general manager, who Plaintiff knows as "John."

199. Plaintiff continues to complain to management regarding the long hours he works.

200. Plaintiff continues to complain to management regarding his demanding schedule.

201. Plaintiff continues to complain to management regarding his failure to receive overtime compensation.

202. Defendants continue to ignore Plaintiff's complaints.

203. Defendants are well aware of the overtime hours worked by Plaintiff.

204. Plaintiff's and other similarly situated employees' overtime hours are part of their regular schedule.

205. The overtime hours worked by Plaintiff and others similarly situated are inherent to their role as operations supervisor.

206. Defendants suffer or permit Plaintiff to work these overtime hours.

207. Regardless of how many hours Plaintiff works, he is only paid his regular salary.

208. Defendants have intentionally misclassified Plaintiff and others similarly situated as salaried employees to avoid paying them overtime.

209. Defendants pay Plaintiff and others similarly situated a salary to circumvent both Federal and Maryland wage laws.

210. The duties performed by Plaintiff and others similarly situated do not implicate any exemptions contained within the FLSA or MWHL.

211. Defendants are well aware that the operations supervisor position is not substantially different from the crew leader and driver positions Plaintiff previously held.

212. Defendants are well aware that the main difference attributable to the operations supervisor position are the increased hours that Plaintiff is required to work.

213. There is no bona fide dispute that Plaintiff and other operations supervisors are owed overtime wages for all hours worked over forty (40) in a workweek.

214. Defendants have failed altogether to pay Plaintiff and other operations supervisors correctly for the overtime hours they worked.

215.    Consequently, Plaintiff, on behalf of himself and all those similarly situated, seeks all wages to which he is entitled and other available relief through this Complaint.

## FLSA COLLECTIVE ACTION ALLEGATIONS

216.    Plaintiff and other similarly situated employees work or worked as operations supervisors for Defendants.

217.    The FLSA requires employers to compensate non-exempt employees such as Plaintiff and others similarly situated overtime wages for all hours worked over forty (40) within a workweek.

218.    Defendants knew that Plaintiff and similarly situated employees typically worked over forty (40) hours per week.

219.    Defendants suffered or permitted Plaintiff and other operations supervisors to work more than forty (40) hours per week.

220.    Defendants knew or should have known that Plaintiff and those similarly situated were entitled to overtime pay for all hours worked over forty (40) in a workweek.

221.    Pursuant to the FLSA, Plaintiff commences this collective action against Defendants on behalf of himself and those similarly situated.

222.    Plaintiff demands damages reflecting an overtime rate of not less than one and a half (1.5) times his regular rate of pay for all hours worked over forty (40) in any workweek within the applicable statute of limitations.

223.    Plaintiff makes these same demands on behalf of all members of the putative class.

224.    Plaintiff consents to be a party plaintiff in this matter.  Plaintiff's consent form is attached to this Complaint as Exhibit A.

225.    It is likely that other individuals will join Plaintiff during the litigation of this matter and file written consents to "opt in" to this collective action.

226.    There are numerous similarly situated current and former employees of Defendants that have been harmed by Defendants' common scheme to underpay its employees and violate the FLSA.

227.    These similarly situated persons are known to Defendants and are readily identifiable through Defendants' records.

228.    Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit.

229.    Upon information and belief, others will choose to join Plaintiff in this action against Defendants and opt in to this lawsuit to recover unpaid wages and other available relief.

## CLASS ACTION ALLEGATIONS UNDER MARYLAND WAGE LAWS

230.    Plaintiff brings this action Pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and other current and former employees that served as operations supervisors and were denied overtime wages owed to them under MWHL for hours worked over forty (40) in a single workweek. Plaintiff and other operations supervisors performed the exact same duties and were subject to the same unlawful payment practices.

231.    *Numerosity:* The individuals in the Class are so numerous that joinder of all members is impracticable.  Although the precise number of such individuals is currently unknown, upon information and belief, the Class includes dozens of employees who are readily identifiable through Defendants' pay records. Numerosity exists.

232.    The class Plaintiff seeks to represent is defined as:

*MWHL Class*

All individuals who are or were employed as operations supervisors by Defendants Manheim Remarketing, Inc. and Cox Enterprises, Inc. (including any subsidiaries) for any period ranging from March 6, 2014 to the present, who were paid on a salary basis and who were not paid an overtime rate of time-and-a-half their regular rate for all hours worked over forty (40) in a week in violation of MWHL.

233. *Commonality:* There are questions of law and fact common to the Class. Among the common questions of law and fact applicable to Plaintiff and the MWHL Class are:

a.    Whether the Class is similarly situated because they all perform the same basic duties and are subject to the same common policy and practice of not paying them overtime;

b.    Whether Defendants employed the Class within the meaning of MWHL;

c.    Whether Defendants violated MWHL by failing to pay Plaintiff and the Class overtime compensation for hours worked in excess of forty (40) per workweek;

d.    Whether Defendants' violations of MWHL were willful; and

e.    Whether Defendants are liable for damages claimed herein, including but not limited to, compensatory, liquidated, statutory, interests, costs and attorneys' fees.

234. *Typicality:* Plaintiff's claims are typical of those of the Class. Specifically, each and every Class member worked at one of Defendants' auction sites. Each and every Class member was required to work well over forty (40) hours per workweek to keep up with Defendants' imposed schedule. Each of the Class members was paid a salary that remained consistent, regardless of the amount of hours worked in each workweek. As a result, each and every Class member suffered the same harm due to Defendants' failure to pay proper overtime premiums for all hours worked in excess of forty (40) hours per workweek in violation of MWHL.

235. *Adequacy:* Plaintiff will fully and adequately protect the interests of the Class in that he seeks the same recovery as the Class, predicated upon the same violations of the law and

the same damage theory. Additionally, Plaintiff has retained counsel who are qualified and experienced in the prosecution of statewide wage and hour class actions. Neither Plaintiff nor his counsel have interests that are contrary to, or conflicting with, the interests of the Class.

236.  *Predominance:* The common issues of law and fact predominate over any individual issues. Each Class member's claim is controlled by Maryland's wage and hour statutory scheme and one set of facts. This is based on Defendants' failure to pay overtime as required by MWHL. Additionally, the damages are eminently certifiable in that Defendants' records will provide the amount each Class member was paid and the amount of time each Class member worked.

237.  This action is maintainable as a class action because the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class. This would establish incompatible standards of conduct for Defendants. The numerous adjudications that would be required to protect the individual interests of the Class members, if they were to pursue their claims separately, would constitute a drain and burden on judicial resources.

238.  Accordingly, the Court should certify the proposed Class.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

***Against Defendants Manheim Remarketing, Inc., t/a Manheim Baltimore-Washington, and Cox Enterprises, Inc., Jointly and Severally***

***Count I - Violation of the FLSA: Failure to Pay Overtime Wages to Plaintiff and all Members of the Collective Class Who, During The Course of This Matter, Opt-In to the Suit by Submitting their Consent Forms to Become a Party Plaintiff***

239.  Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

240.     Plaintiff is entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

241.     As described above, Plaintiff has not received from Defendants compensation reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a workweek; Defendants failed to compensate Plaintiff for these additional hours.

242.     Defendants willfully and intentionally failed to compensate Plaintiff for the overtime wages he is owed.

243.     There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendants.

244.     All members of the putative Collective are similarly situated to Plaintiff and have suffered the same and/or similar harm resulting from the same policies and practices complained of in this Complaint.

245.     All members of the putative Collective are entitled to the same relief as Plaintiff.

246.     Under the FLSA, Plaintiff and all members of the Collective are entitled to additional wages from Defendants to compensate them for the hours they worked in excess of forty (40) in a workweek at a rate of one and one-half (1.5) times their regular hourly wage rate.

***Count II.  Violation of MWHL: Failure to Pay Overtime Wages to Plaintiff, all those that are Joined as a Party Plaintiff in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court and All Members of the MWHL Class, to be Certified by Motion During the Course of This Matter***

247.     Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

248.     Pursuant to Md. Code Ann., Lab. & Empl. § 3-415, each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate.

249.     Pursuant to Md. Code Ann., Lab. & Empl. § 3-420(a), an employer shall compute the wage for overtime under Md. Code Ann., Lab. & Empl. § 3-415 on the basis of each hour over forty (40) that an employee works during one (1) workweek.

250.     Plaintiff has not received compensation from Defendants reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

251.     Defendants willfully and intentionally did not compensate Plaintiff for the overtime wages he is owed.

252.     There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendants.

253.     All members of the MWHL Class are similarly situated to Plaintiff and have suffered the same harm resulting from the same policies and practices complained of in this Complaint.

254.     All members of the MWHL Class are entitled to the same relief as Plaintiff.

255.     Under MWHL, Plaintiff and the MWHL Class are entitled to additional wages from Defendants for all overtime hours worked at a rate of one and one-half (1.5) times their regular hourly wage rate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and others similarly situated, prays for the following relief:

    a)    In accordance with 29 U.S.C. § 216(b), designation of this action as a collective action on behalf of Plaintiff and those similarly situated;

b)      In accordance with Rule 23 of the Federal Rules of Civil Procedure, designation of this action as a Maryland state law class action on behalf of Plaintiff and all members of the proposed class;

c)      Ordering Defendants to disclose in computer format, or in print if no computer readable format is available, the names, addresses and emails of all those individuals who are similarly situated and permitting Plaintiff to send notice of this action to all those similarly situated;

d)      Designating the named Plaintiff to act as class representatives on behalf of all similarly situated employees for the FLSA and Maryland state law classes;

e)      Judgment against Defendants for their failure to pay Plaintiff and those similarly situated in accordance with the standards set forth by the FLSA;

f)      Judgment against Defendants for their failure to pay Plaintiff and members of the MWHL Class in accordance with the standards set forth by MWHL;

g)      Judgment against Defendants and classifying their conduct as willful and not in good faith;

h)      Judgment against Defendants and classifying Plaintiff, members of the Collective, members of the MWHL Class and those appropriately joined in this matter as non-exempt employees entitled to protection under the FLSA and MWHL;

i)      An award against Defendants for the amount of unpaid overtime wages owed to Plaintiff, those similarly situated and those appropriately joined in this matter, calculated at a rate that is not less than one and a half (1.5) times Plaintiff and other similarly situated employees' regular hourly rate for all overtime hours worked;

j)      An award of liquidated damages equal to the total amounts of unpaid wages owed to Plaintiff, those similarly situated, members of the Collective, members of the MWHL Class and those appropriately joined in this matter, whichever is deemed just and equitable by this Honorable Court;

k)      An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendants;

l)      Leave to add additional plaintiffs to all counts alleged herein by motion, through the filing of written consent forms, or any other method approved by this Honorable Court; and

m)      All further relief deemed just and equitable by this Honorable Court.

## **REQUEST FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests that a jury of his peers hear and decide all possible claims brought on behalf of Plaintiff and those similarly situated.

Respectfully submitted,

*/s/ Benjamin L. Davis, III*
Benjamin L. Davis III, Esq. (29774)
bdavis@nicholllaw.com
George E. Swegman (19444)
gswegman@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.:	(410) 244-7005
Fax No.:	(410) 244-8454

*Attorneys for Plaintiff*